**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TOWERCO 2013, LLC,** | **:** | |
| | **:** | |
| **Plaintiff,** | **:** | **Case No. 2:22-cv-03294** |
| | **:** | |
| **v.** | **:** | **Chief Judge Algenon L. Marbley** |
| | **:** | |
| **BERLIN TOWNSHIP,** *et al.*, | **:** | **Magistrate Judge Elizabeth P. Deavers** |
| | **:** | |
| **Defendant.** | **:** | |

**OPINION & ORDER**

Plaintiff TowerCo 2013, LLC ("TowerCo"), seeks a preliminary injunction against Defendants Berlin Township and Berlin Township Board of Trustees, asking that this Court require Defendants allow TowerCo to complete construction and deployment of a telecommunications tower located in Berlin Township. The telecommunications tower is being built on behalf of Verizon and is nearly complete, with only work on the utility extension and antenna left prior to deployment. This Court heard oral arguments on the motion on Tuesday, March 14, 2023.

This matter presents a matter of first impression on how the *Brownfield* immunity doctrine, a creature of Ohio state law, affects the framework set forth in the Telecommunications Act of 1996 ("TCA"), Pub. L. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.), for the preservation of local zoning authority over the placement, construction, and modification of personal wireless service facilities. For the reasons stated more fully herein, this Court finds that Plaintiff has shown a substantial likelihood of success on its TCA claims and **GRANTS** Plaintiff's Motion for Preliminary Injunction (ECF No. 10).

1

## I. BACKGROUND

### A. Factual Background

In late 2019, Verizon Wireless ("Verizon") identified a gap in its wireless coverage of Delaware County. Verizon's wireless communications system relies on a network of overlapping and interconnected individual antenna sites, each of which transmit and receive wireless communication signals between cell phones. (Radio Frequency Analysis Memorandum ("RF Memo.") at 2, ECF No. 10-2). An individual antenna site has a limited range, and thus a limited coverage area. To maintain consistent coverage, Verizon, like other carriers, must place its antenna sites close enough to each other that there are not gaps, but not so close as to be duplicative. (*See id.*). There may still exist inconsistent coverage even where an area is within the range of an antenna site. For example, if the demand for wireless services in that area grows beyond the capacity of the antenna site, some customers may experience "call blocking"—that is, the calls they have placed do not get through because the service area is saturated. (*See id.* at 3). In that case, the carrier can choose to build more channels or cell sites to relieve the problem of existing channels operating at maximum capacity, split the coverage area into smaller segments, each of which is serviced by an individual antenna site, or redirect calls to a different frequency band. (*See id.*).

One issue with this last solution, at least as it pertains to this case, is that the alternative frequency band licensed by Verizon is centered on 2100 MHz, which has less propagation power than the 700 MHz default frequency band and thus provides a much smaller range of coverage; simply adding 2100 MHz antennas to the existing antenna sites (which are spaced based on the coverage range of 700 MHz antennas) would leave gaps in the 2100 MHz network. (*See id.* at 3–4). This was the problem confronting Verizon in 2019: a rapidly growing customer base, and

2

concurrent growth in demand, in Berlin Township, combined with existing antenna site infrastructure that could not be easily upgraded to provide comprehensive alternate frequency coverage. (*Id.* at 3). Accordingly, Verizon proposed building a new antenna site (also called a "communications facility" or "cell tower"), which it referred to as "Berlin Station." (*Id.* at 5).

Verizon worked with PBM Wireless to locate a suitable location for the new antenna site. Based on the coverage needs, they narrowed the search down to a circular area with a half-mile diameter, which consisted primarily of residential developments, property zoned for rural-residential, and land owned by the Olentangy School District ("OSD" or "the School District"). (*Id.* at 6–7). PBM contacted the School District and, after months of discussions, Verizon and OSD reached a lease agreement to site the new tower along the northern edge of a parcel of land that OSD had recently purchased for the construction of a new middle school. (*See id.* at 7; Declaration of Jason Woodward ("Woodward Decl.") ¶ 9, ECF No. 10-1). The parcel is officially listed as Permanent Parcel No. 418-320-01-001-001 ("the Property") in Delaware County. (Woodward Decl. ¶ 9, ECF No. 10-1). The parties signed the lease agreement on October 12, 2021. (*Id.* ¶ 12).

Around the same time, Verizon reached out to Plaintiff TowerCo about the cell tower. TowerCo is in the business of building and deploying wireless telecommunications services, including cell towers; it often partners with Verizon, to build towers that Verizon then leases. (*See id.* ¶¶ 4, 6–7). Here, after Verizon asked TowerCo to build the Berlin Station tower, TowerCo then set about determining if there were any local regulations or requirements with which it had to comply for the cell tower construction.

The Property is located within Berlin Township, which is the local zoning authority, and is zoned as a "farm residential" district. (Declaration of David Hockey ("Hockey Decl.") ¶ 8, ECF

3

No. 10-3; *id.* Ex. B). Section 6.04 of the Township's Zoning Resolution ("BTZR") requires that all telecommunications towers proposed for residential districts comply with Ohio Rev. Code § 519.211, which sets limits on the zoning power of townships vis-à-vis telecommunications towers. (*See id.* Ex. C). Under § 519.211, the party requesting permission to build a telecommunications tower must provide written notice of the project to each owner of property that is "contiguous or directly across a street or roadway from the property on which the tower is proposed to be constructed." If there are no timely objections, the tower is considered exempt and construction may proceed; but if any neighbor objects, the party must obtain a conditional use permit from the local zoning authority. Ohio Rev. Code § 519.211(b)(3)–(4). The BTZR also sets forth two substantive requirements related to telecommunications infrastructure, including: a maximum height of 145 feet and a minimum distance from any lot line of the tower height plus 25%. (Hockey Decl. Ex. 3 § 6.04(C)(4)(b), (e), ECF No. 10-3). The proposal for Berlin Station called for a 195-foot tower, topped by a four-foot lightning arrestor, located 45 feet away (*i.e.*, less than the tower height) from the northern lot line.[1] (*See id.* ¶ 14). The height of the tower was determined by Verizon's coverage requirements.

In keeping with the requirements of § 519.211, TowerCo mailed written notices to the owners of property adjoining the Property on October 6, 2021. (*Id.* ¶ 10). The Township held a special meeting on October 20, 2021, during which neighbors and trustees discussed the proposed cell tower, among other issues, and noted concerns about potential adverse health effects of radio frequency ("RF") emissions emanating from the tower. (*Id.* ¶ 12). Given these concerns and objections filed in response to the written notices, the Township informed TowerCo in late October

---

[1] The School District owns the property to the north as well of the Property on which the cell tower is located.

2021 that it would require TowerCo to apply for a conditional use permit before moving forward with construction.  (*See id.*).  TowerCo, however, took a different approach: it asserted that, pursuant to the state immunity doctrine set forth in *Brownfield v. State*, 407 N.E.2d 1365 (Ohio 1980), *overruled in part on other grounds by Racing Guild of Ohio, Loc. 304, Serv. Emps. Int'l Union, AFL-CIO, CLC v. Ohio State Racing Comm'n*, 503 N.E.2d 1025 (Ohio 1986), it was not required to comply with local zoning regulations, including the conditional use permit application process, for the Berlin Station tower.  It sent a letter explaining its position to the Township on November 11, 2021.  (*Id.* ¶ 15; *see also id.* Ex. E).  Having not yet received a response a week later, TowerCo sent a second letter to the Township on November 19, 2021, again asking the Township to acknowledge TowerCo's assertion of immunity from further administrative procedures.  (*Id.* ¶ 16; *see also id.* Ex. F).  TowerCo requested that the Township respond by November 24, 2021.

On December 9, 2021, still without any response from the Township, TowerCo applied for a building permit from the Delaware County Building Department.[2]  (*Id.* ¶ 17).  In the application, TowerCo wrote that the Township's lack of response to the two letters in November "serves to indicate the Township's assent to the project."  (*Id.* Ex. G).  But, in fact, the Township had not assented.  The Delaware County Prosecutor issued a letter to TowerCo on behalf of the Township, disagreeing with its assertion of immunity; the letter was dated December 23, 2021, but did not reach TowerCo until early January, as it was sent by regular mail.  (*Id.* ¶ 18; *see also id.* Ex. H).

TowerCo ignored the letter from the county prosecutor and, instead, once the Building Department issued a building permit on January 10, 2022, commenced with construction.  (*Id.* ¶

---

[2] The building permit from the County is distinct from a conditional use permit, which is issued by the Berlin Township Zoning Commission ("BZC").

19). By April 2022, the cell tower was nearly complete, and was visible to drivers on the nearby road, such as Ron O'Brien, one of the trustees for the Township. (*Id.* ¶ 22; Prelim. Inj. Hr'g Tr. 87:16–21, ECF No. 30). In early May, the Township issued a letter to the Building Department, in which it described the correspondence between the Township and TowerCo and claimed that TowerCo's December 2021 building permit application had included misrepresentations about the zoning status of the site. (Hockey Decl. Ex. K, ECF No. 10-3; *see id.* ¶¶ 21–22). After receiving the letter, the Building Department issued a stop work order for non-compliance with local zoning regulations on May 17, 2022, but lifted the order on June 10, 2022. (*Id.* ¶¶ 22–23).

Shortly thereafter, the Township filed suit against TowerCo in state court, and the Delaware County Court of Common Pleas issued a temporary restraining order ("TRO"), enjoining TowerCo from further construction of the Berlin Station cell tower. (*See id.* ¶¶ 25–26, 28). That injunction is still in place. As it stands, the cell tower is fully assembled and, to be operational, needs only the installation of electric and fiber wiring, completion of an asphalt driveway, and the addition of Verizon equipment and antennas. (*Id.* ¶ 29). To date, TowerCo has spent approximately $375,144.0 on construction costs, with an additional $50,000 capital contribution and monthly rent payments to OSD as part of the lease agreement. (Woodward Decl. ¶¶ 14–15, ECF No. 10-2).

### B.    Procedural Background

The events set forth above are also the subject of a parallel case in state court, filed by Defendants. (*See* Compl. Ex. N, ECF No. 3-14). Plaintiff TowerCo removed that case to federal court, after filing its answer and counterclaims. Upon Defendants' motion for remand, Plaintiff voluntarily dismissed its counterclaims, which sounded in federal law, without prejudice and acquiesced to remand. (*See* ECF, No. 2:22-cv-02795). After a brief stay in the state court case, Plaintiff then filed this action on August 31, 2022, alleging violations of the Telecommunications

6

Act and the Fifth Amendment's Takings Clause.  (*See generally* Compl., ECF No. 1).  These claims are the same counterclaims asserted and then dismissed in the parallel state court case. Plaintiff then filed its Motion for Preliminary Injunction (ECF No. 10) on November 10, 2022. This Court heard oral arguments on the motion, after which the parties submitted supplemental briefing.  The matter is now ripe for this Court's review.

Additionally, Defendants have filed a motion for judgment on the pleadings, as part of their opposition to the preliminary injunction motion.  (*See* ECF No. 14).  That motion will be addressed separately, as it implicates additional claims beyond the scope of the instant motion.

## II.    STANDARD OF REVIEW

A preliminary injunction is considered an extraordinary remedy, intended "to maintain the status quo pending determination of an action on its merits."  *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976).  As such, the plaintiff bears the burden of demonstrating her entitlement to relief, which will only be granted where "the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

In assessing the need for a preliminary injunction, this Court considers whether the plaintiff has established that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (internal citations omitted).  To establish a strong likelihood of success, the plaintiff is "not required to establish his right to an injunction wholly without doubt," *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) (internal quotation marks and citation omitted), nor "prove his case in full."  *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535,

543 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  Rather, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

Although a strong likelihood of success on the merits is crucial, it is not dispositive on its own and the factors are to be balanced rather than treated as prerequisites.  *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997); *see also Cafcomp Sys.*, 119 F.3d at 400 (noting that "[n]o single factor will be determinative as to the appropriateness of equitable relief" (citing *In re DeLorean Motor Co.*, 755 F.2d at 1229)).  Additionally, "the harm alleged must be both certain and immediate, rather than speculative or theoretical."  *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

### III.    LAW & ANALYSIS

This Court examines each of the four preliminary injunction factors—likelihood of success on the merits, irreparable injury, balance of the equities, and public interest—in turn.

#### A.    Likelihood of Success on the Merits

##### 1.    *Waiver*

As an initial matter, Defendants argue that TowerCo has no chance of success on the merits because it has waived all claims alleged in this suit by voluntarily dismissing them from the parallel state court litigation.  Here, Defendants rely on Ohio R. Civ. P. 13(a), which requires litigants to raise all existing claims arising out of the same transaction or occurrence as counterclaims.  A failure to pursue compulsory counterclaims "provides a basis for waiver that is independent of the more traditional concepts of waiver represented by doctrines like res judicata and collateral

8

estoppel." (Def.'s Resp. in Opp'n at 6, ECF No. 14) (quoting *Pitcher v. Waldman*, No. 1:12-cv-00215, 2013 WL 632368 (S.D. Ohio Feb. 20, 2013)).  The waiver of such claims applies equally to claims that a litigant failed to raise as to claims that a litigant raised but then dismissed without prejudice.  *See Stern v. Whitlatch & Co.*, 631 N.E.2d 680, 682 (Ohio Ct. App. 1993).

But the Sixth Circuit has held that "a federal court cannot enforce a state compulsory-counterclaim rule against a federal litigant outside the preclusion context."  *Quality Assocs., Inc. v. The Proctor & Gamble Distrib., LLC*, 949 F.3d 283, 287 (6th Cir. 2020).  This is because "there is no statute or equitable doctrine authorizing a federal court to enforce state compulsory-counterclaim law" and, thus, "'the pendency of an action in [a] state court' generally is considered 'no bar to proceedings concerning the same matter in the Federal Court having jurisdiction.'"  *Id.* at 288 (first citing MILLER, FED. PRAC. & PROC. § 1418; then quoting *Colo. River Water Conservation. Dist. v. United States*, 424 U.S. 800, 817 (1976) (emphasis in original)).  In other words, Ohio R. Civ. P. 13 cannot be the basis for dismissing a plaintiff's claim that is not otherwise precluded.  Defendants attempt to distinguish this principle by arguing that the plaintiff in *Quality Associates* brought his federal claim (pursuant to 42 U.S.C. § 1981) only as a claim in federal court, whereas TowerCo first asserted its federal claims in state court as counterclaims and then dismissed them without prejudice before re-filing in federal court.  (*See* Defs.' Reply Br. at 2, ECF No. 17).  But Defendants have not explained why this distinction matters.  The absence of authority permitting a federal court to enforce a state compulsory-counterclaim rule applies with equal force whether or not a party has previously asserted the federal claims in state court.  An exception might apply, of course, where the prior assertion in state court provides a basis for preclusion independent of Ohio R. Civ. P. 13; Defendants do not, however, suggest that this is the case.

9

As such, the state compulsory-counterclaim rule does not require the dismissal of TowerCo's claims here simply because they were voluntarily dismissed from the parallel state action.

### 2. Statutory Background

Although TowerCo's complaint presented five claims, its motion for preliminary injunction focuses on the three claims that sound in Section 332(c)(7) of the TCA. The TCA was enacted in 1996 by Congress "to promote competition and higher quality in American telecommunication services and to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (citation and quotation marks omitted). To that end, Congress included in the TCA various provisions for the "reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." *Id.* Thus, the TCA "imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification of such facilities," *id.* (citing 47 U.S.C. § 332(c)(7)), though, of course, these limitations do not entail the wholesale elimination of local government autonomy and authority. *See Town of Amherst v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 13 (1st Cir. 1999) ("The statutory provision before us, 47 U.S.C. § 332(c)(7), is a deliberate compromise between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.").

There are three limitations relevant to this case. First, the TCA requires that:

A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

10

47 U.S.C. § 332(c)(7)(B)(ii). This is known colloquially as the "shot clock" provision, as it sets a deadline for the local government to respond to requests from telecommunications providers for building permits. The Federal Communications Commission ("FCC") has promulgated regulations specifying what constitutes a "reasonable period of time": 90 days for requests relating to collocation and 150 days for all other requests. *In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(b)*, 24 FCC Rcd. 13994 ¶ 32 (Nov. 18, 2009) (hereinafter, "2009 FCC Order"). A failure to act within that timeframe constitutes a shot clock violation.

Second, if the State or local government decides to "deny a request to place, construct, or modify personal wireless service facilities," that decision must "be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). This requirement is intended both to allow wireless providers to understand what to appeal if their application has been denied and to enable courts "to identify the reason or reasons why the locality denied the application" on judicial review. *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 300 (2015). The "substantial evidence" standard does not require that the local authority be correct on all points; in fact, the reasons provided by a local authority "need not be elaborate or even sophisticated, but . . . simply clear enough to enable judicial review." *Id.* at 302. The Sixth Circuit has clarified that the standard "is centrally directed at whether the local zoning authority's decision is consistent with the applicable local zoning requirements" and requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 799 (6th Cir. 2012) (first quoting *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002) (cleaned up); then quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951)).

11

A denial may also run afoul of the TCA's requirement that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). Typical "regulatory" actions implicated by this section of the TCA include the passage of local zoning regulations that ban the construction of all cell towers, as well as zoning "[p]olicies that are facially neutral . . . if those policies, despite being objectively administered in accordance with state and local law and the further requirements of the [Act] have the necessary result that all possible sites in a given area will be rejected." *Laurence Wolf Cap. Mgmt. Tr. v. City of Ferndal*, 61 F. App'x 204, 220–221 (6th Cir. 2003) (alteration in original) (quoting *Va. Metronet, Inc. v. Bd. of Supervisors of James City Cnty.*, 984 F. Supp. 966, 971 (E.D. Va. 1998)). Additionally, the Sixth Circuit has held that the "effective prohibition" provision also implicates case-by-case administrative decisions, such as "a local government's denial of an application for a tower . . . if: (1) the wireless provider can demonstrate there is a significant gap in coverage, and (2) the wireless provider made some inquiry into the feasibility of an alternate location." *W. Bloomfield*, 691 F.3d at 805.

If a telecommunications provider has been "adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof" that contravenes any of the above provisions, it "may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v).

### 3.    *The "Final Action or Failure to Act" Requirement*

Although the TCA has been thoroughly litigated in the quarter century since it was promulgated, this case presents a matter of first impression involving the intersection of the TCA and the *Brownfield* state immunity doctrine. The paradigmatic TCA claim involves a wireless

provider who has applied for a permit from a local zoning authority, which either fails to act on the application or denies the application. Thus, within the context of the TCA, a "final action" that allows a provider to sue is typically understood as a State or local government agency action that "'mark[s] the consummation of the agency's decision making process' and determines 'rights or obligations' or triggers 'legal consequences.'" *T-Mobile S.*, 574 U.S. at 305 n.4 (alteration in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). *But see T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 315 (3rd Cir. 2019) ("Notably, the terms 'act,' 'final action,' and 'decision . . . to deny' are not defined in the TCA."). Another prototypical "final action" is the passage of a municipal regulation affecting the permitting process or construction of cell towers. *See, e.g.*, *Upstate Cellular Network v. City of Auburn*, 257 F. Supp. 3d 309 (N.D. N.Y. 2017) ("However, an effective prohibition claim under the TCA exists where a local government has enacted a moratorium and refuses to process an application." (collecting cases)).

It is undisputed, however, that TowerCo never submitted a permit application for the local zoning agency to consider, and therefore that there has not been an agency decision denying or approving an application. Thus, Defendants suggest that TowerCo's claims are not ripe fir adjudication because the Township has not yet undertaken a "final action."[3]  (*See* Defs.' Resp. in Opp'n at 8–9, ECF No. 14; Defs.' Supp. Br. at 3, ECF No. 31). TowerCo explains that it did not submit an application because it is immune from local government zoning regulations and

---

[3] Defendants also argue that TowerCo's claims fail because TowerCo filed suit more than 30 days after a "final action or failure to act" by the Township with an adverse effect. 47 U.S.C. § 332(c)(7)(B)(v). In support of this argument, Defendants posit a number of actions that they construe as "final": first, their October 20, 2021, letter to TowerCo prohibiting TowerCo from building the cell tower without first applying for and receiving a conditional use permit; second, the December 23, 2021, letter to TowerCo disagreeing with TowerCo's assertion of state immunity; and third, the May 9, 2022, correspondence to the Delaware County Building Department stating that TowerCo's construction should be halted for violations of local zoning regulations. (Defs.' Resp. in Opp'n at 8–9, ECF No. 14). But none of these letters represents the culmination of an agency decision making process and, thus, are not final actions.

13

procedures pursuant to the *Brownfield* state immunity doctrine. In order to reach TowerCo's TCA claims, this Court must first address what qualifies as a "final action" (or failure to act) where state law allows a provider to circumvent the typical administrative decisions challenged under the TCA.[4] *See also Glob. Tower Assets, LLC v. Town of Rome*, 810 F.3d 77, 82 (1st Cir. 2016) (noting that "the finality of administrative action serves as a prerequisite to obtaining judicial relief under [] the TCA").

In *Brownfield v. State*, the Supreme Court of Ohio held that the state government (and its subdivisions) is immune from compliance with local zoning restrictions, but only after first making a "reasonable attempt to comply with the zoning restrictions of the affected subdivision." 407 N.E.2d at 1368 (internal citations omitted). This immunity also "appl[ies] to the activities of private entities when the activities are done in agreement with the state and in furtherance of the identified state purpose," as "it is not the private status of the [entity] that is relevant but, rather, the public nature of the activity sought to be regulated . . . that determines whether the state immunity doctrine may be implicated." *GTE Wireless of the Midwest, Inc. v. Anderson Twp.*, 731 N.E.2d 201, 210 (Ohio Ct. App. 1999). Further, if a state actor[5] has made reasonable efforts at compliance but compliance would defeat essential government objectives, then the agency "may proceed unless enjoined by a court of competent jurisdiction." *Taylor v. State Dep't of Rehab. & Corr.*, 540 N.E.2d 310, 316 (Ohio Ct. App. 1988).

*Brownfield* immunity is, at least according to the intermediate state appellate court in *Taylor*, a self-executing doctrine: once it is asserted, the state actor may proceed until that assertion

---

[4] As explained further below, this Court makes no judgment on the parties' contentions about whether TowerCo is entitled to *Brownfield* immunity.

[5] For the sake of simplicity, this Court uses the phrase "state actor" to refer to both the land-owning state entity and its private partner, where the two are collectively engaged in an activity with a public purpose.

14

is challenged and overturned in court. This is apparently because the *Brownfield* doctrine only requires state actors to make reasonable efforts to comply with substantive zoning restrictions before asserting immunity, but not local zoning procedures (such as requirements to apply for a conditional use permit from the zoning authority). *See id.* at 314–15 ("Never does *Brownfield* mention or contemplate compliance with local zoning *procedures* to obtain an exception to current zoning use restrictions." (emphasis in original)); *see also Brownfield*, 407 N.E.2d at 1368. The idea of a self-executing immunity doctrine is undoubtedly unusual, as it allows state agencies and their private partners to assert quasi-judicial power in determining their entitlement to legal immunity from local zoning regulations. Nevertheless, the Attorney General of Ohio has twice issued advisory opinions in agreement with this interpretation. *See* Op. Ohio Att'y Gen. 2001-002; Op. Ohio Att'y Gen. 2008-022. In fact, one advisory opinion explicitly repudiated a previous opinion that had concluded that a state actor's duty to make reasonable attempts to comply with local zoning regulations, prior to asserting *Brownfield* immunity, required the state actor to apply first for the relevant permits. *See* Op. Ohio Att'y Gen. 2001-002 at 2-13 n.4. Thus, where a telecommunications provider partners with a state entity and asserts *Brownfield* immunity, the only way for a local zoning authority to stop construction is to sue the provider for an injunction; it need not comply with local zoning regulations and procedures (including the permit application process) unless enjoined by a court of competent jurisdiction.

Given that unusual background, TowerCo argues that, because it was not required to submit a permit application, Defendants' June 2022 state court lawsuit, in which they asked the Delaware County Court of Common Pleas to enjoin construction of the cell tower, constitutes a "final action" for the purposes of the TCA. (Pl.'s Supp. Br. at 8, ECF No. 32). Defendants maintain that only an administrative approval or denial of a permit application constitutes the requisite "final action."

15

(Defs.' Supp. Resp. at 2, ECF No. 33) (collecting cases).  The state court lawsuit, on the other hand, seeks to halt construction only as a means of requiring TowerCo to submit a permit application to the local zoning board—it is, according to Defendants, an action that merely "map[s] a procedural route that [TowerCo] must take in order to proceed with its project." *Sprint Spectrum L.P. v. City of Carmel*, 361 F.3d 998, 1004 (7th Cir. 2004), *abrogated on other grounds by Horne v. Dep't of Agric.*, 569 U.S. 513 (2013); *see also Ottawa Twp. Bd. of Trs. v. New Par*, No. 3:17-cv-00419, 2019 WL 1923331, at *11 (N.D. Ohio Apr. 30, 2019) (noting that "courts have uniformly held that a wireless provider's effective-prohibition claim is not ripe, or is otherwise premature, if the relevant zoning authority has not denied an application from the provider" (citations omitted)).[6]

The default TCA paradigm assumes that a telecommunications provider cannot construct a cell tower without first "submit[ting] a plan . . . and appl[ying] for a special use permit," after which it will be "told definitely whether or not it is permitted to install" telecommunications infrastructure.  *Sprint Spectrum*, 361 F.3d at 1004.  But as the foregoing makes clear, where the *Brownfield* state immunity doctrine applies,[7] that paradigm is inapplicable; a basic tenet of doctrine is that state actors may forego the usual permitting process.  In this context, defining "any final action" to cover only the denial of a permit application, as is typical in TCA jurisprudence, would render the *Brownfield* doctrine a nullity; it would prevent wireless providers from bringing a TCA

---

[6] The *New Par* case discussed a similar, but not identical, fact pattern, in which telecommunications providers sought to build cellular towers free from local zoning regulations and alleged violations of the TCA without first submitting permit applications.  The providers claimed exemption from local regulations based on Ohio Rev. Code § 519.211 as public utilities, rather than under the *Brownfield* immunity doctrine, and there is no indication that the public utility exemption is self-executing.

[7] Defendants argue that *Brownfield* immunity does not apply here.  (*See, e.g.*, Defs.' Supp. Resp. at 2, ECF No. 33).  But whether the doctrine is rightly applicable or not, the fact remains that TowerCo asserted immunity, at which time, the only remedy for Defendants was to pursue an injunction.  *See Taylor*, 540 N.E.2d at 316.

16

claim unless they first apply for a permit—*i.e.*, the very same administrative procedure from which *Brownfield* provides immunity.  Therefore, in order to give full effect to Ohio state law, *see City of Rancho Palos Verdes*, 544 U.S. at 128 (Breyer, J., concurring) ("Congress initially considered a single national solution [in the TCA.] . . .  But Congress ultimately rejected the national approach and substituted a system based on cooperative federalism." (citations omitted)), this Court reads the statutory language of "any final action or failure to act of a State or local government or instrumentality thereof" to include more than just decisions on permit applications where there has been assertion of *Brownfield* immunity.  47 U.S.C. § 332(c)(7)(B)(v).

Such a decision constitutes the culmination of the local government's decision-making process, *see Bennett*, 520 U.S. at 177–78 (citation omitted), and, while the decision itself does not itself determine rights or obligations, it is the only action under state law that local authorities can take to alter the rights and obligations of the party asserting *Brownfield* immunity.  Moreover, this understanding of the TCA accords with the only other court decision this Court is aware of that discusses the intersection of a state law immunity doctrine and the TCA.  In *Crown Commc'n N.Y. Inc. v. Dep't of Transp. of the State of N.Y.*, the New York Court of Appeals considered a lawsuit brought by a telecommunications provider seeking to avoid local zoning rules by asserting immunity under state law; the provider did not submit a permit application prior to filing suit.  *See* 824 N.E.2d 934 (N.Y. 2005).  The state high court in that case explicitly upheld the supremacy of state law immunity over local zoning, noting that, "[w]hile the TCA may not limit a [local] government's zoning ability, it does not dictate that a locality's regulations trump state interests where competing interests exist."  *Id.* at 939–40.

Thus, Defendants' decision to pursue an injunction in state court constituted a "final action" with adverse effects for the purposes of the TCA—satisfying the ripeness requirement and

triggering the 30-day clock for TowerCo to file suit.  *See* 47 U.S.C. § 332(c)(7)(B)(v).  The state

court suit was filed on June 21, 2022.  (*See* Hockey Decl. ¶ 26, ECF No. 10-3).  The parties jointly

entered a stay on July 15 pending negotiations; the negotiations were unsuccessful as of August

31, 2022, and the state court case was reactivated on September 8, 2022.  (*Id.* ¶ 27; Rogers Decl.

Ex. B, ECF No. 10-5 at 89; Pl.'s Ex. C, ECF No. 15-3 at 4).  This case was filed on August 31,

2022, within 30 days of the filing of the state court case, after accounting for the joint stay.  *See*

2009 FCC Ruling ¶ 49.

### 4.    *Shot Clock Violation*

Having established that TowerCo's claims are ripe and are not time-barred, this Court next

turns to the merits.  TowerCo has alleged that Defendants violated three provisions of the TCA.

First, TowerCo argues that Defendants were required to respond within a reasonable

time—*i.e.*, within 150 days—of its request for authorization.  Specifically, TowerCo characterizes

its November 11, 2021, letter to the Township, in which it asserted its exemption from local zoning

regulations pursuant to *Brownfield* and asked the Township to acknowledge that assertion, as a

"request for authorization."  (*See* Mot. for Prelim. Inj. at 19–20, ECF No. 10).  TowerCo further

asserts that Defendants did not respond to that letter until after May 9, 2022.  As noted previously,

the typical TCA claim involves a "request for authorization" in the form of a permit application.

TowerCo maintains that that level of formality is not required, however, arguing instead that "an

informal request for authorization . . . is sufficient" to trigger the Township's obligation to act.

(Pl.'s Supp. Br. at 3, ECF No. 32) (citing *GTE Mobilnet, Inc. v. Pierce Twp.*, 1998 U.S. Dist.

LEXIS 22007 (S.D. Ohio Nov. 6, 1998)).

But TowerCo's behavior belies its claim that the November letter was a "request for

authorization."  After all, a "request" implies asking for permission.  *Cf. Request*, BLACK'S LAW

DICTIONARY (11th ed. 2019).  If a request to do something is rejected (or ignored), the requestor may not proceed to do that thing anyway.  By contrast, when TowerCo did not receive an immediate response to its November letter, it chose to move forward with construction of the tower.  When it later did receive a response disputing the assertion of immunity, it chose to ignore the response and continued with construction.  In other words, TowerCo did not "request" authorization from the local zoning authority,[8] because it did not believe it needed authorization from the Township.

Note also that, in TowerCo's second letter, dated November 19, 2021, TowerCo wrote that "there is no reason for [this] process to extend beyond November 24, 2021 and therefore we expect written verification [confirming TowerCo's immunity] no later than that date."  (Hockey Decl. Ex. F, ECF No. 10-3).  That deadline was a mere 13 days after the first letter sent to the Township. But if, as TowerCo claims, the initial letter was a "request for authorization" within the meaning of Section 332(c)(7)(B)(ii), then the Township, by federal regulation, is allotted 150 days to respond.  TowerCo's attempt to establish an arbitrary, 13-day deadline for the Township to respond to the "request of authorization" directly contradicts that regulation, without providing any explanation suggesting that it had the authority to do so.  In other words, either TowerCo did not truly view its own letter as a "request for authorization" or it attempted to rush the Township into a decision, in contravention of binding regulations.  This Court concludes, based on the foregoing,

---

[8] The only case that TowerCo cites on this point, *GTE Mobilnet, Inc. v. Pierce Twp.*, is an unpublished decision of this Court from 1998 that involved a letter from the plaintiff wireless provider asking for "authorization to proceed with the construction of its tower on the proposed site."  1998 U.S. Dist. LEXIS 220007, at *14.  There is no indication that the plaintiff in that case was authorized to proceed without the zoning authority's permission, which is what TowerCo claims that it was authorized to do; that case involved the statutory "public utility exemption," not a common law immunity doctrine.

that TowerCo's November letter to the Township did not constitute a "request for authorization" that triggered the shot clock provision.

Moreover, even if the November letter was a "request for authorization," the Township in fact responded to it "within a reasonable period of time." Specifically, the Delaware County Prosecutor, writing on behalf of the Township and its Board of Trustees, issued a letter to TowerCo disagreeing with TowerCo's assertion of immunity and explaining why Defendants believed that TowerCo was required to comply with the local zoning regulations. The letter was sent on December 23, 2021, and reached TowerCo in early January 2022—well within 150 days of November 11, 2021. TowerCo suggests that the letter was focused on "unrelated caselaw," and thus that the Township's refutation of TowerCo's assertion of immunity was baseless. (Mot. for Prelim. Inj. at 24 n.2, ECF No. 10). It also argues that the letter was an inadequate response, and that, if Defendants sought to oppose TowerCo's assertion of immunity, they should have sued for an injunction. But neither the correctness of the Township's legal analysis nor the adequacy of its response is at issue here. The letter was a response to TowerCo's request for authorization; judicial remedies are available if TowerCo believed that the response mischaracterized caselaw or undertook the wrong approach. *See, e.g.*, *GTE Wireless of the Midwest*, 713 N.E.2d at 204 (seeking declaratory relief that plaintiff wireless provider was statutorily immune from local zoning requirements, upon being told that township intended to enforce zoning regulations); 47 U.S.C. § 332(c)(7)(B)(v) (creating a cause of action for violations of the TCA).

Accordingly, TowerCo has not demonstrated a substantial likelihood of success on the merits of its shot clock violation claim.

20

5. *Effective Prohibition of Personal Wireless Services*

TowerCo also alleges that Defendants have violated Section 332(c)(7)(B)(i)(II) of the TCA, which dictates that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services," by suing in state court to enjoin construction of the tower. 47 U.S.C. § 332(c)(7)(B)(i). As an initial matter, this Court notes that Defendants' initiation of suit in state court deviates from the typical "regulation[s] of the construction, placement, or modification of personal wireless services," which includes, for example, a blanket ban on cell towers, a zoning regulation that is applied so as to reject all proposed cell sites, *see City of Ferndal*, 61 F. App'x at 220–21, or the denial of a permit application. Nevertheless, a suit asking to enjoin construction of telecommunications facilities is undoubtedly an attempt "[t]o control, govern, or direct [the provision of wireless services], esp. by means of regulations or restrictions." *Regulate*, OXFORD ENGLISH DICTIONARY (3rd ed. 2009).

As noted previously, the Sixth Circuit has held that a local government's regulatory actions preventing the construction of a cell tower may violate the "effective prohibition" provision if the wireless provider can provide "(1) a showing of a significant gap in service coverage and (2) some inquiry into the feasibility of an alternative facilities or site locations." *W. Bloomfield*, 691 F.3d at 805 (internal quotation marks and citation omitted). The required showing for a "significant" gap is not particularly high: the carrier need only demonstrate a gap in its own service, and not the service of any other carrier. *See id.* at 807 (adopting the FCC's approach and rejecting the "blanket ban" approach of the Second, Third, and Fourth Circuits). The FCC has further clarified that an "effective prohibition" may occur not only when a state or local government regulation prevents a

wireless provider from filling a coverage gap, but also when such regulation prevents a provider from densifying an existing wireless network. *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088 ¶ 37 (Sept. 27, 2018) ("2018 FCC Ruling"), *vacated in part by City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020).

Defendants argue that this clarification is inapplicable to the Berlin Station tower for two reasons. First, they suggest the 2018 FCC Ruling applies only to "Small Wireless Facilities," which the tower in this case is not. *See id.* ¶ 11 n.9 (defining "Small Wireless Facilities" to include only those facilities that, among other criteria, are mounted on structures that are either 50 feet or less in height, are no more than 10 percent taller than neighboring structures, or do not extend existing structures by more than 50 feet or by more than 10 percent). But while the 2018 FCC Ruling is concerned primarily with the regulation of Small Wireless Facilities, it discusses the relevant legal standard for what constitutes "the effect of prohibiting wireless telecommunication services" under Section 332(c)(7)B(i)(II)—and concludes that regulation inhibiting the densification of existing networks is an effective prohibition, without differentiating between facility types. *See id.* ¶ 37; *see also In the Matter of California Payphone Ass'n Petition of Preemption*, 12 FCC Rcd. 14191 ¶ 31 (July 17, 1997).

Additionally, Defendants suggest, pursuant to *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.*, that deference to the 2018 FCC Ruling's interpretation of "effective prohibition" is not warranted because the relevant statutory language of Section 332(c)(7)(B)(i) is unambiguous. 467 U.S. 837 (1984). But, on this Court's read, "the effect of prohibiting the provision of personal wireless services" is a vague phrase, capable of a host of reasonable interpretations. And in fact, courts have repeatedly upheld the FCC's interpretations of this provision of the TCA. *See, e.g.*,

*City of Portland*, 969 F.3d at 1034–35 (noting the Ninth Circuit's continued ratification of the FCC's decision in *California Payphone* on the test for "effective prohibition"). Defendants cite a single case suggesting otherwise: *Crown Castle NG E. LLC v. Town of Hempstead*, No. 17-cv-03148, 2018 WL 6605857 (E.D. N.Y. Dec. 17, 2018). (*See* Defs.' Supp. Resp. at 3–4, ECF No. 33). That case concluded that the language of the TCA was unambiguous based on the Second Circuit's narrow interpretation of the "effective prohibition" provision of the statute in *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630 (2d Cir. 1999)—which the Sixth Circuit has explicitly rejected. *W. Bloomfield*, 691 F.3d at 806–07. This Court therefore concludes that, given the breadth of the 2018 FCC Ruling's discussion of the "effective prohibition" standard and the ambiguity in the statutory language, regulations preventing the densification of cell towers (and not only Small Wireless Facilities) can constitute the effective prohibition of the provision of personal wireless services under 47 U.S.C. § 332(c)(7)(B)(i).

With respect to whether there is a significant gap in coverage, TowerCo has provided evidence that Verizon identified a coverage gap in its 2100 MHz service network in the Township, which the cell tower is intended to fill. Verizon's RF analysis for the tower noted that, though the area was covered within its 700 MHz network, the Township has experienced rapid population growth in recent years and the 700 MHz network is no longer sufficient to support the larger customer base in the Township; as the 700 MHz network is already at capacity (*i.e.*, Verizon has added the maximum number of 700 MHz cell radios to existing antenna sites in the area), the only way to expand coverage is to augment the 2100 MHz network. (*See* RF Memo. at 3–4, ECF No. 10-2). The analysis included an RF propagation map, displaying the coverage area of the current 2100 MHz network and the identified gap. (*Id.* fig. 1).

Defendants suggest that this analysis is insufficient to show a "significant" gap in coverage, as there are no records provided of customer complaints, blocked calls, or information about the capacity of existing towers.  (*See* Defs.' Supp. Br. at 4–7, ECF No. 31) (citing Prelim. Inj. Hr'g Tr. 66:11–67:17, 70:4–71:22, ECF No. 30).  But courts in this Circuit have not required so substantial an evidentiary burden for demonstrating a "significant gap in coverage." *See Eco-Site, Inc v. City of Huber Heights*, No. 3:16-cv-00388, 2018 WL 3092901, at *22 (S.D. Ohio June 22, 2018) ("There is no requirement that actual customer complaints need to be submitted to demonstrate a coverage gap." (citing *W. Bloomfield*, 691 F.3d at 807)); *see, e.g.*, *W. Bloomfield*, 691 F.3d at 803–04, 807 (finding a significant gap in coverage where T-Mobile submitted an RF report with coverage maps, drive test data, and evidence that new facility would service customers on major thoroughfares and in densely-populated subdivisions).  While it is not clear that unrefuted RF propagation maps alone are enough, without some modicum of additional corroborating data,[9] to prove a "significant gap in coverage" at trial, they are sufficient at this preliminary stage to establish a substantial likelihood that TowerCo will be able to do so.

TowerCo has also adequately demonstrated that Verizon conducted a meaningful comparison of alternatives before choosing the current site of the Berlin Station tower.  As set forth by the Sixth Circuit, the "least intrusive" standard requires a provider to show "that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc." *W. Bloomfield*, 691 F.3d at 808 (quoting *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 398 (3rd Cir.

---

[9] Apparently, there exists additional Verizon metrics on call coverage and related data showing the coverage gap.  That evidence, however, has not been presented to this Court.

2003)). Here, Verizon determined that the coverage gap it had identified could be serviced by a cell tower located anywhere within a circle with a half-mile radius, primarily encompassing land owned by the School District. Verizon's partner, PBM Wireless, discussed various site location options on the School District's land within that circle with the School District and searched fruitless for existing tall structures as options to mount the antenna equipment on, before ultimately agreeing to a location proposed by the School District. (*See* Deposition of Jeff Gordon ("Gordon Dep.") 31:7–32:10, ECF No. 10-5).[10] Defendants suggest that this is insufficient to establish a "good faith effort" to identify less intrusive alternatives, because Verizon did not consider any possible cell sites outside of the School District property, nor inquire into the possibility of alternative designs, like two, shorter towers instead of a single, 195-foot tall tower. (Defs.' Supp. Br. at 6–7, ECF No. 31) (citing Prelim. Inj. Hr'g Tr. 64:7–14, 69:5–70:24, ECF No. 30).

But the "least intrusive" standard does not require a provider to conduct an exhaustive search until every possible alternative has been eliminated; that is, after all, the standard adopted elsewhere that the Sixth Circuit has explicitly rejected. *See W. Bloomfield*, 691 F.3d at 808. Verizon need only have conducted a meaningful consideration of other possibilities. The fact that the site location was decided upon through an iterative process with the School District, and that the ultimate choice came at the suggestion of the School District, favors the conclusion that the Verizon satisfied its obligations. *See id.* Moreover, Verizon had focused on the School District's

---

[10] In support of this proposition, TowerCo offers the deposition of Jeff Gordon, who is the Director of Business Management and Facilities for Olentangy Local Schools. (*See* Mot. for Prelim. Inj. at 3, ECF No. 10) (citing Deposition of Jeff Gordon ("Gordon Dep."), ECF No. 10-5). Defendants object to the use of this deposition, and other declarations and documents, as "not properly admitted evidence before this Court" because they were not presented during the Rule 65 hearing held on March 14. (*See* Defs.' Supp. Resp. at 2, ECF No. 33). But, given the comparatively informal nature of preliminary injunction procedures, *see Camenisch*, 451 U.S. at 395, it has generally been accepted that evidence not presented in a Rule 65(a) hearing can still be considered by this Court in ruling on a motion for a preliminary injunction, especially as "Rule 65 does not explicitly require an oral hearing on a preliminary-injunction motion." *See* WRIGHT & MILLER, 11A FED. PRAC. & PROC. (3rd ed.) § 2949. Defendants have not provided any evidence disputing Mr. Gordon's testimony.

property in an effort to minimize disruption to areas zoned as residential.  Verizon was not required

to consider sites that were too far away to address the coverage gap or designs incapable of doing

so.  *Id.*  And Defendants have not suggested alternatives that would solve the gap, nor identified

any existing tall structures in the area that Verizon's allegedly "cursory" search failed to uncover.

(Defs.' Supp. Br. at 6, ECF No. 31).

Accordingly, as TowerCo has shown that the cell tower would densify Verizon's network

and that Verizon conducted a meaningful search for alternatives prior to selecting the site, this

Court concludes that TowerCo has demonstrated a substantial likelihood of success on its effective

prohibition claim.

### 6. *Written Response with Substantial Evidence*

Lastly, TowerCo alleges that the Township failed to issue a written denial supported by

substantial evidence, in violation of Section 332(c)(7)(B)(iii).  The "substantial evidence"

requirement of the TCA has been construed by the Sixth Circuit (and other courts of appeals)

against the background "context of federal administrative law."  It looks to "the nature of the

evidence before the local zoning board [that approved or denied a permit application] and whether

it is substantial."  *W. Bloomfield*, 691 F.3d at 798.  Thus, a court "may not overturn [the zoning

authority's] decision on 'substantial evidence' grounds if that decision is authorized by applicable

local regulations and supported by a reasonable amount of evidence (i.e., more than a 'scintilla'

but not necessarily a preponderance)."  *Id.* at 798–99 (quoting *MetroPCS, Inc. v. City & Cnty. of

S.F.*, 400 F.3d 715, 725 (9th Cir. 2005)).

TowerCo's "substantial evidence" claim rests on Defendants' decision to ask the state court

for an injunction.  (*See* Pl.'s Reply Br. at 13, ECF No. 15) (framing the state court motion for

injunction as "the Township's true denial of TowerCo's request for authority").  Of course, as this

Case: 2:22-cv-03294-ALM-EPD Doc #: 39 Filed: 08/18/23 Page: 27 of 31  PAGEID #: 2164

Court has noted previously, no zoning authority has denied a request from TowerCo; to construe the state court complaint and motion for injunction as a "denial" requires this Court to extend traditional understandings of the TCA to the novel context of *Brownfield* immunity.  But even assuming *arguendo* that the state court motion for injunction is a "denial," it does not appear that Defendants' decision to file that motion lacked substantial evidence.  TowerCo suggest that "the concerns expressed by Trustee Raehll relating to the alleged adverse health effects of radio frequency emissions" are "the primary rationale for the filing made by the Township in the state court."  (Mot. for Prelim. Inj. at 23, ECF No. 10).  This is supported by the fact that a letter from Trustee Megan Raehll was included in Defendants' state court complaint as evidence that residents of the Township are concerned about the cell tower.  (Am. Compl. Ex. N, ECF No. 5-15 at 35).  But, according to TowerCo, "it is well-established that such considerations are placed beyond the scope of local governments" by statute, and thus Defendants' reliance on that rationale violates the "substantial evidence" requirement.  (Mot. for Prelim. Inj. at 23, ECF No. 10) (citing 47 U.S.C. § 332(c)(7)(B)(iv)).

But the "substantial evidence" inquiry looks to "applicable state and local regulations . . . and evaluate[s] the [] decision's evidentiary support (or lack thereof) relative to those regulations." *MetroPCS*, 400 F.3d at 724.  In other words, it asks whether the local government's decision was justified in light of its authority and its reasons.  Here, TowerCo does not dispute that the Township Board of Trustees is authorized to sue to enforce its local zoning regulations under Ohio law— and, specifically, it is authorized to require telecommunications providers to apply for a conditional use permit where owners of property adjoining a telecommunications project object.  *See* Ohio Rev. Code § 519.211.  And that is exactly what the Board of Trustees did, supported by a "reasonable amount of evidence."  Its residents had expressed concerns about the proposed cell

tower, and so TowerCo sought to assert its statutorily-granted local zoning authority. (*See generally* Am. Compl. Ex. N, ECF No. 5-15; *see also* Defs.' Supp. Br. at 2–3, ECF No. 31). That is well within the Township's prerogative.[11] Moreover, the state court granted the Board's request for a preliminary injunction, further suggesting that the motion for an injunction was not a deviation from the Board's statutory authority. (*See* Am. Compl. Ex. P, ECF No. 5-17). TowerCo's argument effectively asks this Court to review (and overturn) that state court decision, as it argues that the motion for a preliminary injunction, and therefore the grant of an injunction, was not warranted. This Court declines the invitation.

In short, Defendants' decision to sue in state court was justified as an assertion of their statutory rights. Moreover, it was also justified as a means of resolving the question of whether TowerCo is entitled to *Brownfield* immunity, a question on which Defendants have also proffered substantial evidence. (*See* Defs.' Supp. Br. at 2–3, ECF No. 31). Seeking judicial resolution of that question, after all, is exactly what TowerCo has consistently suggested is Defendants' only recourse. This Court concludes that TowerCo has not shown a substantial likelihood of success on its third, "substantial evidence" TCA claim.

### B. Irreparable Injury

TowerCo asserts that it "is likely to suffer irreparable harm in the absence of preliminary relief," *Winter*, 555 U.S. at 20, because the continued gap in Verizon coverage in Berlin Township will cause the loss of customer goodwill.[12] The Sixth Circuit has noted that "[t]he loss of customer

---

[11] As TowerCo notes, of course, it is outside the Township's prerogative to deny a conditional use permit application on account of RF considerations, which it has not done. *See* 47 U.S.C. § 332(c)(7)(B)(iv).

[12] TowerCo also argues that, in the absence of injunctive relief, it will not be able to complete, deploy, or earn income from the tower, for which it has already spent $375,000 in construction costs plus monthly rent payments to the School District. (*See* Mot. for Prelim. Inj. at 26, ECF No. 10). But these are purely monetary harms, which are not considered irreparable. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparably. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the

goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 2012) (citing *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)); *see also Lexington-Fayette Urb. Cnty. Gov. v. BellSouth Telecomms., Inc.*, 14 F. App'x 636, 639–40 (6th Cir. 2001) (affirming a district court's finding that a wireless provider's delayed entry into a market and resulting loss of customers constituted an irreparable harm). Such harms have been recognized as irreparable explicitly in the context of TCA violations. *See, e.g.*, *Indep. Wireless One Corp. v. Town of Charlotte*, 242 F. Supp. 2d 409, 416 (D. Vt. 2003).

Of course, Verizon is not a party to this case, though TowerCo is constructing the cell tower on Verizon's behalf. TowerCo is not directly suffering irreparable harms in the form of lost goodwill from Verizon's customers or lost business due to a delayed entry into the market. But such harms to Verizon rebound on TowerCo: if TowerCo's inability unable to complete the cell tower for Verizon causes Verizon to lose customer goodwill, then TowerCo will in turn lose goodwill from its longtime customer, Verizon. And while TowerCo has not yet experienced a slowdown in business with Verizon or other cell service providers,[13] such harms are impending in the absence of an injunction. There is a difference, after all, between a mere delay in the construction of the Berlin Station tower and the wholesale cancellation of the project. The former is not ideal, but tolerable; the latter foments distrust in TowerCo's ability to be a reliable partner. Such distrust is undeniably irreparable: the damages flowing from the loss of trust in a business partner are substantial and incalculable. *See Basicomputer*, 973 F.2d at 512.

---

absence of a stay, are not enough." (quoting *Va. Petro. Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958))).

[13] Jason Catalini, the general counsel for TowerCo, testified during the hearing that TowerCo continues to work on new projects for and enter new contracts with both Verizon and other cell providers without interruption. (Prelim. Inj. Hr'g Tr. 48:23–49:5, ECF No. 30).

This Court therefore concludes that, at this preliminary stage of the litigation, the irreparable injury factor favors Defendants.

## C.     Balance of the Equities

TowerCo also suggests that a preliminary injunction will be beneficial for residents of the Township, because it will improve wireless coverage without any harm to third parties, as the tower is up to code and is located entirely on the School District's property. (*See* Pl.'s Mot. for PI at 26, ECF No. 10). Any stated concerns about RF emissions, as asserted by the Township in its state court filings, are insufficient for finding that the balance of the equities tips against granting a preliminary injunction, because the regulation of cell towers based on such concerns is impermissible. *See* 47 U.S.C. § 332(c)(7)(B)(iv) (prohibiting State or local governments from regulating personal wireless service facilities that are otherwise in compliance with FCC regulations "on the basis of the environmental effects of radio frequency emissions").

Defendants gesture vaguely at the argument that an injunction against public officials tasked with enforcing public regulations would cause harm to others. (*See* Defs.' Resp. in Opp'n at 22–23, ECF No. 14) (citing *Fort Iron & Metal Co. v. City of Detroit*, No. 21-cv-12886, 2022 WL 159419 (E.D. Mich. Jan. 18, 2022)). Defendants do not, however, specify what harm this would cause. The case Defendants rely on involved a proposed injunction against public officials in charge of enforcing a public safety order that had been issued specifically in response to multiple incidents at the plaintiff's scrap metal facility, which had caused substantial public and private harm, including the partial collapse of two buildings. *Fort Iron & Metal Co.*, 2022 WL 159419, at *2, *12. Granting the injunction would have lifted that safety order, allowing the facility to operate again and potentially lead to further accidents. *See id.* at *12 (noting that the "correction order weeks to protect others by ensuring that Fort Iron's operations do not cause another ground

upheaval or similar damage").  In other words, the defendants in that case had identified a specific harm that would result from enjoining the enforcement of the public safety regulation at issue.  By contrast, Defendants here have asserted a nebulous claim of a potential generalized harm that may be caused by enjoining its trustees, when the only effect of an injunction would be the completion of the cell tower.

### D.    Public Interest

TowerCo argues that an injunction is in the public interest because, as mentioned, completion of the tower will benefit residents of the Township and because an injunction is the appropriate remedy for violations of the TCA.  (*See* Mot. for Prelim. Inj. at 28–29, ECF No. 10). Defendants concede that the injunction will benefit customers and residents.  (Defs.' Resp. in Opp'n at 22, ECF No. 14).

### IV.    CONCLUSION

For the reasons stated more fully above, this Court concludes that TowerCo has shown a substantial likelihood of success on its "effective prohibition" claim, pursuant to Section 332(c)(7)(B)(i)(II) of the TCA and that TowerCo has established it will suffer irreparable injuries in the absence of a preliminary injunction.  Accordingly, this Court **GRANTS** TowerCo's Motion for Preliminary Injunction (ECF No. 10).  The Township is **ENJOINED** during the pendency of this action from preventing the completion and deployment of the cell tower.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  August 18, 2023**

31